1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOSEPH ARTHUR RODRIGUEZ,

        Plaintiff,

   v.

M. S. EVANS, et al.,

        Defendants.

_____/

No. C 05-05068 SBA (PR)

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
**AND ADDRESSING PENDING MOTION**

(Docket nos. 52, 80)

## INTRODUCTION

Plaintiff Joseph Arthur Rodriguez, a state prisoner currently incarcerated at California State

Prison - Centinela, filed the instant pro se civil rights action under 42 U.S.C. § 1983.  He alleges a

violation of his constitutional rights while he was incarcerated at Salinas Valley State Prison

(SVSP), stemming from an incident where prison officials subjected him to excessive force during a

cell extraction on December 28, 2004.

Defendants now move for summary judgment on the grounds that there are no material facts

in dispute and that they are entitled to judgment as a matter of law.  Defendants also claim that they

are entitled to qualified immunity.

For the reasons outlined below, the Court GRANTS Defendants' motion for summary

judgment and addresses their other pending motion.

## PROCEDURAL BACKGROUND

On December 8, 2005, Plaintiff filed a complaint alleging: (1) excessive use of force by

SVSP prison officials, specifically Defendants Captain G. Lewis, Lieutenant V. Elmore, and

Sergeant N. Walker, during a cell extraction; (2) failure by Defendants SVSP Correctional Officers

D. Prewitt, M. Narvaez, B. Gantt, B. Busick, C. Lonero, S. Lima, A. Mata, M. Hood, and F. Nuno to

intervene when excessive force was used against Plaintiff; (3) deliberate indifference to Plaintiff's

serious medical needs by two SVSP medical workers who cleared him after the extraction;

(4) supervisory liability against four SVSP wardens and a SVSP chief deputy warden; (5) a due

process violation by four SVSP prison officials who handled Plaintiff's administrative appeal; and

United States District Court
For the Northern District of California

(6) a due process violation stemming from prison disciplinary hearings involving Plaintiff and relating to the cell extraction. (Compl. at 3-4.)

In an Order dated October 30, 2008, the Court found that Plaintiff alleged a cognizable excessive force claim against Defendants Lewis, Elmore, and Walker. (Oct. 30, 2008 Order at 4.) The Court also found that Plaintiff alleged a cognizable excessive force claim against Defendants Prewitt, Narvaez, Gantt, Busick, Lonero, Lima, Mata, Hood, and Nuno for their failure to intervene. (Id.) Plaintiff's deliberate indifference and supervisory liability claims were dismissed with leave to amend because he had failed to allege facts sufficient to state cognizable claims for relief. (Id. at 4-5.) In addition, Plaintiff's claim relating to the grievance process and his due process violation claim were dismissed with prejudice. (Id.) The Court directed Plaintiff to amend his deliberate indifference and supervisory liability claims by November 29, 2008, and informed him that the failure to do so would result in the dismissal of the two claims. (Id.)

On December 22, 2008, Plaintiff filed an amendment to the complaint and alleged additional facts relating to his deliberate indifference and supervisory liability claims. (Am. Compl. at 3-4.)

In an Order dated January 21, 2009, the Court referred the case to Magistrate Judge Vadas for a settlement proceeding that was to take place on or before March 23, 2009. (Jan. 21, 2009 Order at 1.) The Court also directed Plaintiff and Defendants to abide by the briefing schedule detailed in the Court's October 30, 2008 Order of Service, and stated that no further extensions of time would be granted absent exigent circumstances. (Id.)

In another Order dated February 6, 2009, the Court found that Plaintiff's allegations in his amendment to the complaint failed to cure the pleading deficiencies of his original deliberate indifference and supervisory liability claims; therefore, the Court dismissed both claims without further leave to amend. (Feb. 6, 2009 Order at 3-5.) Thus, Plaintiff's only remaining claim is his Eighth Amendment excessive force claim.

On February 25, 2009, Defendants Lewis, Elmore, Walker, Prewitt, Narvaez, Gantt, Busick, Lonero, Lima, Mata, Hood, and Nuno filed a motion for summary judgment on the grounds that Defendants used pepper spray in a "good faith attempt to protect their own safety and maintain

United States District Court
For the Northern District of California

security at the prison" because the pepper spray was "administered only after Plaintiff refused to comply with Defendants' repeated demands that he exit his cell so that staff could search for a missing metal portion of an electric hair clipper that could have been used as a weapon." (Mot. for Summ. J. at 7, 8.)  In the alternative, Defendants claim that they are entitled to qualified immunity because Plaintiff has failed to show that his constitutional rights were violated during the cell extraction.  (Id. at 10.)  In addition, Defendants maintain that, even if their actions were unconstitutional, they are nonetheless entitled to qualified immunity because it would not have been clear to a reasonable prison official that their actions were unlawful.  (Id.)

In an Order dated March 4, 2009, the Court noted that Defendants' motion for summary judgment is supported in part by a videotape of the cell extraction, and directed Defendants to submit a copy of said videotape.  (Mar. 4, 2009 Order at 2.)  The Court also noted that Plaintiff must be given the opportunity to view the videotape in order to respond to Defendants' motion for summary judgment.  (Id.)  The Court directed Defendants to bring the videotape to the settlement conference, and stated that Judge Vadas had the discretion to allow Plaintiff to view the videotape before, during, or after the conference.  (Id. at 3.)  The Court directed Plaintiff to file his opposition by March 27, 2009, and that no further extensions of time would be granted absent exigent circumstances.  (Id. at 2.)

On March 6, 2009, Defendants submitted a copy of the videotape of the cell extraction. (Defs.' Notice of Lodging of Cell Extraction Videotape at 1.)

On March 9, 2009, Plaintiff, Defendants' counsel, and a representative from the California Department of Corrections and Rehabilitation met for a settlement conference before Judge Vadas. (Mar. 25, 2009 Report of Settlement Proceeding at 1.)  The parties were unable to reach an agreement, but agreed to meet for a follow-up settlement within sixty days after the summary judgment ruling.  (Id. at 2.)

On March 17, 2009, Plaintiff filed a notice of a change of address stating that he had been transferred to California State Prison - Solano to attend the Court-ordered settlement conference.  In that notice, Plaintiff states:

3

1
2
3
4

> I would like to inform the Court with all this transfering, [sic] is going to have an effect on my behalf to properly replie [sic] to summary judgment if filed by Defendants and is only going to make the issuse [sic] more complex and difficult to research, so I pray the Court gives [sic] me enough time to answer back to summary judgment.  Also I believe I was told by March 27, 2009 I need to reply and if you deny Defendants summary judgment I will be re-schedule [sic] in (60) days and transfer [sic] to C.S.P. Solano within Vacaville.

5   (Mar. 17, 2009 Notice of Change of Address at 2.)

6          On March 26, 2009, Plaintiff filed another notice of a change of address inquiring whether

7   the Attorney General had filed a motion for summary judgment following the March 9, 2009

8   settlement conference.  (Mar. 26, 2009 Notice of Change of Address at 1.)  Plaintiff also noted that,

9   although he had been transferred back to California Correctional Institution from California State

10  Prison - Solano, he was still "without legal materials and property."  (Id.)

11         In an Order dated April 3, 2009, the Court directed Defendants to provide a copy of the

12  motion for summary judgment to Plaintiff.  (Apr. 3, 2009 Order at 2.)  The Court also gave Plaintiff

13  an extension of forty-five days to file his opposition.  (Id.)

14         On May 4, 2009, Plaintiff informed the Court that he was being transferred to California

15  State Prison - Centinela.  (May 4, 2009 Notice of Change of Address at 1.)

16         In an Order dated May 12, 2009, the Court granted Plaintiff a second extension of time to file

17  his opposition.

18         On May 18, 2009, Plaintiff filed his opposition.[1]

19         On May 29, 2009, Defendants filed a reply to Plaintiff's opposition.

20         On June 22, 2009, Plaintiff filed a sur-reply.

21         On June 26, 2009, Defendants filed a motion to strike Plaintiff's sur-reply on the ground

22  Plaintiff did not seek permission to file a sur-reply, as required by the Northern District of

23  California's Local Rules.  Specifically, Civil Local Rule 7-3 provides, in pertinent part, that "once a

24  reply is filed, no additional memoranda, papers or letters may be filed without prior court approval."

25  Civ. L. R. 7-3(d).

26

27         [1]  In his opposition, Plaintiff stated that he "needed more time to reply to [the] summary judgment [motion]."  (Opp'n at 9.)  He further stated, "This is the best I can do with the limited time provided to me at [the] moment."  (Id.)

28

4

United States District Court
For the Northern District of California

1    On July 13, 2009, Plaintiff filed a belated request for permission to file a sur-reply (docket

2    no. 82).  He states that at the time he filed his opposition on May 21, 2009, he was "unaware [he]

3    was granted an extension of time to June 18, 2009" to file his opposition.  (Pl.'s July 13, 2009

4    Request at 1.)  Therefore, he claims that on June 18, 2009, when he filed his sur-reply, he was

5    "under the impression [he] could respond to Defendants['] motion and [he] was still capable to [file

6    an opposition] before June 18, 2009."  (Id.)  He requests the Court to "let [the sur-reply] be included

7    [with his] May 18, 2009 opposition."  (Id.)  He also claims that he presented "newly discovered

8    evidence" in his sur-reply.  (Id.)  Finally, he argues that "Defendants failed to provide this Court

9    with [the] remainer [sic] of [the] incident report . . . ."  (Id.)

10    Good cause appearing, Defendants' motion to strike is DENIED, and Plaintiff's sur-reply will

11    be considered as part of his opposition to the motion for summary judgment.  However, upon

12    reviewing the sur-reply, the Court finds that Plaintiff has raised the same arguments as those in his

13    opposition.  As Plaintiff presents no new issues in his sur-reply that need to be addressed by

14    Defendants, they need not respond to the sur-reply.

15    **DISCUSSION**

16    **I.    Legal Standard**

17    Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that

18    there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a

19    matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

20    case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

21    genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

22    party.  Id.

23    The party moving for summary judgment bears the initial burden of identifying those

24    portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue

25    of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will

26    have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable

27    trier of fact could find other than for the moving party.  But on an issue for which the opposing party

28

United States District Court
For the Northern District of California

1  will have the burden of proof at trial, as is the case here, the moving party need only point out "that

2  there is an absence of evidence to support the nonmoving party's case." Id. at 325.

3        Once the moving party meets its initial burden, the nonmoving party must go beyond the

4  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

5  genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

6  material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

7  Anderson, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine

8  issue of triable fact.  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has

9  the burden of identifying, with reasonable particularity, the evidence that precludes summary

10  judgment.  Id.  If the nonmoving party fails to make this showing, "the moving party is entitled to

11  summary judgment as a matter of law." Celotex, 477 U.S. at 323.

12        The district court's function on summary judgment motion is not to make credibility

13  determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W.

14  Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence and the

15  inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving

16  party.  See id. at 631.  If evidence produced by the moving party conflicts with evidence produced

17  by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving

18  party with respect to that fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  A

19  court may not disregard direct evidence on the ground that no reasonable jury would believe it.  See

20  id. (where nonmoving party's direct evidence raises genuine issues of fact but is called into question

21  by other unsworn testimony, district court may not grant summary judgment to moving party on

22  ground that direct evidence is unbelievable).  The district court may not resolve disputed issues of

23  material fact by crediting one party's version of events and ignoring another.  Wall v. County of

24  Orange, 364 F.3d 1107, 1111 (9th Cir. 2004) ("By deciding to rely on the defendants' statement of

25  fact [in deciding a summary judgment motion], the district court became a jury.").  But "[w]hen

26  opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

27  that no reasonable jury could believe it, a court should not adopt that version of the facts for

28

1   purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 127 S. Ct.

2   1769, 1776-77 (2007).

3   **II.   <u>Evidence Considered</u>**

4       A district court may only consider admissible evidence in ruling on a motion for summary

5   judgment. <u>See</u> Fed. R. Civ. P. 56(e); <u>Orr v. Bank of Am.</u>, 285 F.3d 764, 773 (9th Cir. 2002).

6   Unauthenticated documents and hearsay evidence are inadmissible, and consequently, may not be

7   considered on summary judgment. <u>Orr</u>, 285 F.3d at 773-74, 778.

8       In support of their motion for summary judgment, Defendants have submitted a declaration

9   by their attorney, Michael Quinn (docket no. 54), and a declaration by Defendant Walker (docket no.

10  53).

11      Attached to Mr. Quinn's declaration are three documents concerning the cell extraction:

12  (1) the Incident Report; (2) the Incident Commander's Review/Critique; and (3) the Manager's

13  Review.  (Quinn Decl., Ex. B, C, D.)  Also attached to Mr. Quinn's declaration is the declaration of

14  the California Correctional Institution custodian of records, certifying that the attached three

15  documents are true and correct copies of the original documents.  (Quinn Decl., Ex. A.)  Because

16  these three documents have been properly authenticated pursuant to Federal Rule of Evidence

17  803(6), the Court will consider these documents in connection with Defendants' motion for summary

18  judgment.

19      Attached to Defendant Walker's declaration is a copy of a portion of the SVSP Use of Force

20  Policy relating to cell extraction and a copy of the portion of the incident report relating to the cell

21  extraction.  (Walker Decl., Ex. A, B.)  Defendant Walker states that the submitted exhibits are

22  accurate copies of what they purport to be.  (Walker Decl. ¶¶ 2, 15.)  Defendant Walker's declaration

23  is sufficient to authenticate the SVSP Use of Force Policy because, as a SVSP correctional officer,

24  he is familiar with the contents of that document.  Therefore, the Court will also consider the Use of

25  Force Policy in connection with the instant summary judgment motion.  Because the entire incident

26  report, attached to Mr. Quinn's declaration, is evidence already considered in connection with

27  Defendants' motion for summary judgment, there is no need to consider the portion of the same

28  report that is attached in Defendant Walker's declaration.

1    The Court will also consider as evidence a copy of the videotape of Plaintiff's cell extraction

2    on December 28, 2004 (docket no. 61), which was submitted by Defendants.

3    Plaintiff has verified his complaint and opposition by signing both under penalty of perjury.

4    Therefore, aside from considering his opposition, the Court may treat the allegations in the verified

5    complaint as an opposing affidavit to the extent such allegations are based on Plaintiff's personal

6    knowledge and set forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d

7    454, 460 & nn.10-11 (9th Cir. 1995) (treating a plaintiff's verified complaint as opposing affidavit

8    where, even though verification not in conformity with 28 U.S.C. § 1746, he stated under penalty of

9    perjury that contents were true and correct, and allegations were not based purely on his belief but

10   on his personal knowledge).

11   Attached to Plaintiff's complaint are his 602 inmate appeals concerning the cell extraction

12   and the corresponding decisions for these appeals.  (Compl., Ex. A.)  Also attached are the Rules

13   Violations Report and portions of the Incident Report related to the cell extraction.  (Compl., Ex. B,

14   C.)  Because the entire incident report, attached to Mr. Quinn's declaration, is evidence already

15   considered in connection with the summary judgment motion, there is no need to consider the

16   portion of the same report that is attached in Plaintiff's complaint.  However, the documents relating

17   to Plaintiff's 602 appeals and the Rules Violations Report are not admissible evidence because they

18   have not been properly authenticated pursuant to Federal Rule of Evidence 803(6), and will not be

19   considered by the Court.

20   The Court notes that Plaintiff did not sign his sur-reply under penalty of perjury.  Even if the

21   Court did not strike Plaintiff's sur-reply, nothing in it can be considered as evidence because it was

22   not verified.  Cf. Johnson v. Meltzer, 134 F.3d 1393, 1400 (9th Cir. 1998) (verified motion functions

23   as an affidavit).  Plaintiff was cautioned about summary judgment requirements and consequences,

24   see Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998) (en banc), in the Court's Order of Service.  In

25   any event, contrary to Plaintiff's claim, he has not presented "newly discovered evidence" in his sur-

26   reply.  As mentioned above, his sur-reply is identical to his opposition; therefore, there is no new

27   evidence for the Court to consider.  Even if there was newly discovered evidence presented,

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   nowhere in his sur-reply does Plaintiff explain how this newly discovered evidence shows that there

2   is a genuine issue for trial.

3          Also in his opposition and sur-reply, Plaintiff raises issues regarding the evidence presented

4   by the Defendants in support of their motion for summary judgment.  In his opposition, Plaintiff

5   claims that Defendants are "attempting to introduce inappropriate evidence" by attaching a

6   completed copy of the "Calculated Use of Force Manager/AOD Report."  (Opp'n at 8 (citing Quinn

7   Decl., Ex. B, Incident Report at AGO-0056).)  The Court notes that Plaintiff has attached the same

8   form to his complaint; however, his copy had not been filled out and completed prior to him

9   attaching it to his complaint.  (Compl., Ex. C at 11.)  Plaintiff has made a conclusory argument that

10  Defendants have presented "false documentary evidence," and he has failed to support his argument

11  with any evidence.  Therefore, the Court finds Plaintiff's argument unavailing.  Defendants have

12  merely supplied the Court with a completed copy of the form, which was signed and dated on

13  January 6, 2005 by the "Facility Captain/Correctional Captain/AOD."  (Quinn Decl., Ex. A.,

14  Incident Report at AOG-0056.)

15         In his sur-reply, Plaintiff states that "the incident commander's review/critique use of force

16  incidents, that Mr. Quinn added, [shows that] the full packet is not there, there[] [are] pages still

17  missing such as Video Tape Record of Cell Extraction Reason For Extraction; Video Tape Record

18  Cell Extraction Medical Briefing; Video Tape Record of Cell Extraction Inform the Inmate, these

19  are form(s) still missing." (Sur-reply at 7.)  Attached to the sur-reply as "Exhibit A" are eight pages

20  of a what seems to be a blank incident report containing the aforementioned forms.  Therefore,

21  Plaintiff claims that Defendants failed to provide the Court with a complete incident report.

22  However, even if this is true, the Court will be considering other more compelling evidence,

23  including a copy of the videotape of the cell extraction, as mentioned above.  Plaintiff also alleges in

24  his sur-reply that "Defendants only provided S.V.S.P. Use of Force Policy, [and] they did not

25  attached [sic] operational procedure 29 for D-9 ad-seg, which is much differant [sic] that the use of

26  force of '96' written policy." (Id. at 2.)  He adds that he sought the production of a "written or copie

27  [sic] of D-9 ad-seg policies." (Id.)  It seems that Plaintiff's request was not granted because he has

28

9

United States District Court
For the Northern District of California

1  failed to attach a copy of the aforementioned policy to his sur-reply.  Plaintiff merely states that this

2  policy is "differant [sic]" but does not explain how it is relevant to his claim.  The Court finds

3  unavailing Plaintiff's argument regarding the need to consider the "D-9 ad-seg policies" because the

4  SVSP Use of Force Policy sufficiently sets forth the prison's policy governing the use of force.

5  **III.**   **Factual Background**

6        **A.**   **Defendants' Version**

7        On December 28, 2004, SVSP prison officials conducted cell searches because the metal

8  portions of a clipper head were missing.  (Walker Decl. ¶ 4; Quinn Decl., Ex. B, Incident Report at

9  AGO-0003.)  Defendants claim that the missing metal portions could be "used to manufacture

10 weapons by cutting pieces of metal from the cell doors or sink and toilet areas."  (Walker Decl.

11 ¶ 4;Quinn Decl., Ex. B, Incident Report at AGO-0010.)  At approximately 10:40 a.m. that same day,

12 the prison officials conducting the search informed Defendant Walker that six inmates in the E

13 section of Facility D-9 Administrative Segregation Unit (ASU), including Plaintiff, refused to exit

14 their cells.  (Id.)  Defendant Walker, who was the D9 ASU Sergeant, then approached the cells of

15 these six inmates and ordered them to submit to handcuffs prior to the cell search.  (Walker Decl.

16 ¶ 5;Quinn Decl., Ex. B, Quinn Decl., Ex. B, Incident Report at AGO-0003, 0010.)  All six inmates

17 refused to comply.  (Walker Decl. ¶ 5; Quinn Decl., Ex. B, Incident Report at AGO-0010.)

18 Defendant Walker notified Defendant Elmore of the inmates' noncompliance.  (Walker Decl.

19 ¶ 6;Quinn Decl., Ex. B, Incident Report at AGO-0010.)  Defendant Elmore, who was the D-9 ASU

20 Lieutenant, then "approached each of the cells and attempted to convince the inmates to comply with

21 the orders."  (Id.)  The inmates again refused to comply, and Defendant Elmore informed Defendant

22 Lewis of their failure to comply.  (Id.)  At that time, Defendant Walker instructed the D-9 prison

23 staff to assemble the cell extraction equipment, pending authorization from Defendant Lewis.  (Id.)

24 Defendant Lewis arrived at that section, and authorized the cell extraction of the six inmates.

25 (Walker Decl. ¶ 6; Quinn Decl., Ex. B, Incident Report at AGO-0010-0011.)

26       The extraction team was assembled, and a nurse and a video camera operator were retained.

27 (Walker Decl. ¶ 7.)  This took approximately thirty minutes.  (Id.)  Defendant Walker then assigned

28

United States District Court
For the Northern District of California

1  Defendant Lonero to be the scribe, and Defendants Mata and Lima to be serve as video camera

2  operators during the cell extractions.  (Id. ¶ 8; Quinn Decl., Ex. B, Incident Report at AGO-0011.)

3  The extraction team was identified on video.  (Walker Decl. ¶ 9; Quinn Decl., Ex. B, Incident Report

4  at AGO-0011.)

5       Four of the six noncompliant inmates were extracted before Plaintiff.  (Id. ¶¶ 9-11; Quinn

6  Decl., Ex. B, Incident Report at AGO-0011.)  Defendants Walker, Elmore, Prewitt and Busick then

7  went to Plaintiff's cell.  (Walker Decl. ¶ 12; Quinn Decl., Ex. B, Incident Report at AGO-0011.)

8  Defendant Elmore read an admonishment to Plaintiff and his cellmate in a final attempt to gain their

9  compliance.  (Walker Decl. ¶ 12; Quinn Decl., Ex. B, Incident Report at AGO-0011.)  However,

10  instead of submitting to be handcuffed, Plaintiff and his cellmate pulled linen from the top bunk to

11  cover themselves.  (Cell Extraction Videotape.)  Defendant Elmore took their actions as a refusal to

12  submit to be handcuffed.  (Id.)  Defendant Walker was then "given permission to proceed with the

13  cell extraction."  (Walker Decl. ¶ 12.)  Defendant Walker first approached Plaintiff's cell and again

14  asked Plaintiff and his cellmate to submit to handcuffs.  (Id.)  When Defendant Walker received no

15  response, he proceeded with the extraction.  (Cell Extraction Videotape.)  Defendant Walker utilized

16  three T-16 O.C. grenades and a MK-9 in an attempt to gain compliance from Plaintiff and his

17  cellmate.  (Walker Decl. ¶ 13; Quinn Decl., Ex. B, Incident Report at AGO-0011, 0013; Cell

18  Extraction Videotape.)  Plaintiff and his cellmate continued to "pull[] linen and other clothing from

19  the top bunk in order to cover themselves and avoid the effects of the chemical agents."  (Walker

20  Decl. ¶ 13.)  The videotape shows that Defendant Walker then ordered Plaintiff and his cellmate to

21  "uncover" themselves.  (Cell Extraction Videotape.)  When Defendant Walker received no response,

22  he used a MK-46 and sprayed inside the cell.  (Walker Decl. ¶ 13.)  A few seconds after Defendant

23  Walker began to use MK-46, the videotape shows that the linen from the top bunk that seemed to be

24  shielding the bottom bunk fell down or was pulled down.  (Cell Extraction Videotape.)  The

25  videotape then shows that Defendant Walker ceased spraying the MK-46 as soon as Plaintiff and his

26  cellmate became visible.  (Id.)  Plaintiff and his cellmate then approached the front of their cell, and

27  prison officials ordered them first to submit to unclothed body searches.  (Id.; Quinn Decl., Ex. B,

28

1   Incident Report at AGO-0011.)  Both of them were then placed in handcuffs.  (Walker Decl. ¶ 14;

2   Quinn Decl., Ex. B, Incident Report at AGO-0011, 0013.)  After they were handcuffed, Defendant

3   Hood opened the door to allow them to exit their cells.  (Walker Decl. ¶ 14; Quinn Decl., Ex. B,

4   Incident Report at AGO-0011.)  Defendant Narvaez attached leg irons to Plaintiff's legs.  (Id.)

5   Defendants Nuno and Busick then escorted Plaintiff to the shower area for decontamination.

6   (Walker Decl. ¶ 15; Quinn Decl., Ex. B, Incident Report at AGO-0011.)  Following the

7   decontamination, Plaintiff was examined by an emergency room nurse, and was placed in a

8   temporary holding cell.  (Walker Decl. ¶ 15; Quinn Decl., Ex. B, Incident Report at AGO-0011,

9   0036.)  Ms. Pollan, the nurse who examined Plaintiff following the extraction, noted that Plaintiff

10  was "sprayed and extracted without incident."  (Quinn Decl., Ex. B, Incident Report at AGO-0036.)

11  She also states that, while Plaintiff was known to be asthmatic, the extraction process did not result

12  in an exacerbation of his asthma.  (Id.)

13          **B.       Plaintiff's Version**

14          Plaintiff confirms he was subjected to a cell extraction on December 28, 2004.  (Compl. at

15  3.)  He alleges that Defendant Lewis "authorized the use of force," and that Defendant Elmore "gave

16  instructions to proceed with the tactical cell extraction.  (Id.)  Plaintiff admits that he was extracted

17  from his cell because the prison officials claimed to have lost a "clipper head."  (Id.)  However,

18  Plaintiff contends that Defendant Walker's "recklessness was maliciously and sadistically [done] to

19  cause harm," and that Defendant Walker used T-16 O.C. grenades, a MK-9, and a MK-46 even

20  though "there was never immediate danger" to Plaintiff, his cellmate, the prison staff, or any other

21  people.  (Id.)  Plaintiff thus claims that this excessive use of force in subjecting him to cell extraction

22  was unjustified and violated his constitutional rights.  (Id. at 4.)

23          In his opposition, Plaintiff states that even though he refused a direct order to "cuff up," there

24  was no need for Defendants to use an "enormous amount of force" to extract him from his cell.

25  (Opp'n at 3-4.)  Furthermore, Plaintiff claims that he told Defendants that neither he nor his cellmate

26  had the missing "hair clipper[s]," so Defendants knew that they "did not have clippers . . . yet, they

27  pursue[d] to cell extract [him]."  (Id. at 4.)  Finally, Plaintiff claims that a review of the videotape

28

1    evidence will show that "compliance was already in effect with [him] and celly right afther [sic] the

2    3 T-16 O.C. bombs went off, [and] there was no need to use the MK-9 and MK-46 . . . ."  (<u>Id.</u> at 6.)

3    **III.    Excessive Force Claim**

4        **A.    Applicable Law**

5        A prisoner has the right to be free from cruel and unusual punishment, including physical

6    abuse by guards.  Whenever prison officials stand accused of using excessive physical force in

7    violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-

8    faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  <u>Hudson</u>

9    <u>v. McMillian</u>, 503 U.S. 1, 6-7 (1992) (citing <u>Whitley v. Albers</u>, 475 U.S. 312, 317 (1986)).  In

10   determining whether the use of force was for the purpose of maintaining or restoring discipline, or

11   for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application

12   of force, the relationship between that need and the amount of force used, the extent of any injury

13   inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper

14   the severity of a forceful response.  <u>See</u> <u>Hudson</u>, 503 U.S. at 7; <u>see</u> <u>also</u> <u>Spain v. Procunier</u>, 600 F.2d

15   189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).  If the

16   force officers use is so disproportionate to that required that it suggests deliberate sadism, the use of

17   force violates the Eighth Amendment.  <u>Whitley v. Albers</u>, 475 U.S. 312, 322 (1986); <u>Madrid v.</u>

18   <u>Gomez</u>, 889 F. Supp. 1146, 1172 (N.D. Cal. 1995) (finding that although cell extractions are "an

19   essential tool in maintaining security in any prison," pattern of unnecessary extractions and massive

20   force employed violated Eighth Amendment).

21       Still, not every criticism of an officer's conduct suggests excessive force.  <u>Whitley</u>, 475 U.S.

22   at 322.  The Eighth Amendment does not prohibit uses of force that appear unreasonable in

23   hindsight, so long as the officers were acting in good faith and for a legitimate end.  <u>Id.</u>; <u>compare</u>

24   <u>Clement v. Gomez</u>, 298 F.3d 898, 903-04 (9th Cir. 2002) (applying Eighth Amendment "malicious

25   and sadistic" standard to prison pepper spray incident) <u>with</u> <u>Headwaters Forest Defense v. County of</u>

26   <u>Humboldt</u>, 240 F.3d 1185, 1198-1206 (9th Cir. 2001), <u>vacated on other grounds</u>, 533 U.S. 194

27   (2001) (applying Fourth Amendment "objectively reasonable" excessive force standard to police use

28

**United States District Court**
For the Northern District of California

1   of pepper spray).  In order for an Eighth Amendment excessive force case to go to the jury, the

2   evidence must go "beyond a mere dispute over the reasonableness of a particular use of force or the

3   existence of arguably superior alternatives"  to support "a reliable inference of wantonness in the

4   infliction of pain." Whitley, 475 U.S. at 322.

5   **B.   Analysis**

6   Plaintiff contends that Defendant Walker acted with malicious intent when he used pepper

7   spray during Plaintiff's cell extraction.  (Compl. at 3.)  He also maintains that Defendant Walker's

8   use of force was excessive given that "there was never immediate danger" to anyone that warranted

9   such use of force.  (Id.)  However, Plaintiff's arguments are unavailing because he fails to back up

10   his allegations with "specific, nonconclusory, factual allegations" that would, if proven, show bad

11   motive.  See Jeffers v. Gomez, 267 F.3d 895, 907 (9th Cir. 2001).  Plaintiff concedes that, on the day

12   of the incident, SVSP prison officials were looking for the missing metal clipper head.  (Compl. at

13   3.)  Moreover, the evidence shows that Plaintiff repeatedly disobeyed orders to submit to handcuffs

14   prior to the cell search.  (Walker Decl. ¶¶ 4-6, 12; Cell Extraction Videotape.)  It was only after

15   Plaintiff repeatedly failed to submit to handcuffs that Defendant Walker used pepper spray to extract

16   Plaintiff from his cell.  (Walker Decl. ¶ 12.)  Indeed, the videotape evidence shows that Defendant

17   Elmore asked Plaintiff one last time to submit to handcuffing before the cell extraction was initiated.

18   (Cell Extraction Videotape.)  However, Plaintiff still refused to comply and covered himself with

19   linen.  (Id.)  Defendant Elmore thus properly perceived Plaintiff's action as a refusal to comply.  The

20   videotape evidence also shows that Defendant Walker again asked Plaintiff to submit to handcuffs,

21   but he received no response.  (Id.)  When Defendant Walker first administered the pepper spray

22   using three T-16 O.C. grenades and a MK-9, he alleges that Plaintiff and his cellmate continued to

23   cover themselves with linen.  (Walker Decl. ¶ 13.)  However, Plaintiff claims that a review of the

24   videotape evidence will show that "compliance was already in effect with [him] and celly right

25   afther [sic] the 3 T-16 O.C. bombs went off . . . ." (Opp'n at 6.)  The Court has reviewed the

26   videotape evidence and finds that Plaintiff's claim -- that he and his cellmate complied after the three

27   T-16 O.C. grenades were used -- is not supported by the record.  The videotape evidence

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  corroborates Defendants' version of the cell extraction.  (Cell Extraction Videotape.)  The videotape

2  evidence does not show that Plaintiff or his cellmate complied after Defendant Walker utilized the

3  three T-16 O.C. grenades.  (Id.)  Instead, the videotape evidence shows that Defendant Walker

4  ordered Plaintiff and his cellmate to "uncover" themselves after he deployed the 3 T-16 O.C.

5  grenades and utilized a MK-9.  (Id.)  This corroborates Defendant Walker's claim that Plaintiff and

6  his cellmate "pulled linen and other clothing from the top bunk in order to cover themselves and

7  avoid the effects of the chemical agents." (Walker Decl. ¶ 13.)  As mentioned earlier, when

8  opposing parties "tell two different stories," if no reasonable jury could believe Plaintiff's

9  allegations, then the Court should not adopt his version of the facts for the purposes of ruling on a

10  motion for summary judgment.  See Scott, 127 S. Ct. at 1776-77 (police officer entitled to summary

11  judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless

12  driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or

13  no actual threat to innocent bystanders).  Therefore, the Court will not adopt Plaintiff's version that

14  he and his cellmate complied after the three T-16 O.C. grenades were used.  Instead, the Court

15  adopts Defendants' version that Plaintiff and his cellmate covered themselves with linen and other

16  clothing after the three T-16 O.C. grenades and the MK-9 were used.  The videotape evidence shows

17  that the first movement that could be construed as compliance by Plaintiff and his cellmate was

18  when the linen from the top bunk dropped down, and this occurred after Defendant Walker began to

19  spray the inside of the cell with the MK-46.  (Cell Extraction Videotape.)  Defendant Walker ceased

20  spraying the MK-46 as soon as Plaintiff and his cellmate became visible and submitted to handcuffs.

21  (Id.)  Accordingly, Plaintiff's allegations are insufficient to raise a genuine issue of material fact

22  regarding Defendant Walker's intent to harm.  See Spain, 600 F.2d at 195.

23          Plaintiff also contends that Defendants Lewis and Elmore should be held liable because they

24  authorized the cell extraction.  (Compl. at 3.)  Again, Plaintiff fails to back up his allegations with

25  "specific, nonconclusory, factual allegations" that would, if proven, show bad motive for such

26  authorization.  See Jeffers, 267 F.3d at 907.  Plaintiff's allegations are therefore insufficient to raise a

27  genuine issue of material fact regarding Defendants Lewis and Elmore's intent to harm given the

28

15

1   uncontested evidence regarding the safety risk posed by the missing metal clipper head, the need to

2   find the missing metal clipper head, and Plaintiff's repeated refusal to submit to handcuffs.

3   Moreover, the evidence shows that Defendants Lewis, Elmore, and Walker adhered to the SVSP Use

4   of Force Policy in extracting Plaintiff from his cell.  The SVSP Use of Force Policy states that:

> When an inmate refuses to submit to the application of restraint gear or comply with
> staff's instructions, the Facility Sergeant shall always be notified.  When it is
> determined that an inmate must be removed from the area, i.e. cell, yard, or pod, by
> force, the following procedure will be adhered to:
>
> a.   Extractions shall be accomplished only when there is a clear threat to the
> safety of others, the inmate, and/or security of the institution.  At any point in
> time that the inmate becomes cooperative, the use of force shall be
> discontinued and the inmate shall be placed in mechanical restraints and
> removed from the area.
>
> b.   An extraction shall not be conducted without the physical presence of medical
> personnel.  Upon completion of an extraction, the inmate shall be evaluated
> by the medical personnel, which shall be documented on CDC form 7219.
>
> c.   After verbal persuasion has failed and it has been determined that the inmate
> will not submit to the application of restraints, the Facility Lieutenant/Watch
> Commander will recommend to the Facility Captain/Correctional Captain or
> Administrative Officer of the Day that an extraction is necessary.  The
> Facility Captain/Correctional Captain or Administrative Officer of the Day
> shall determine if an extraction will be completed.

16  (Walker Decl., Ex. A.)  In accordance with the SVSP Use of Force Policy, the prison officials

17  conducting the search for the missing metal clipper head informed Defendant Walker, who was the

18  Facility Sergeant, of Plaintiff's refusal to submit to handcuffs.  Defendant Walker failed to gain

19  Plaintiff's compliance to submit to handcuffs; therefore, Defendant Walker informed Defendant

20  Elmore, who was the Facility Lieutenant, about Plaintiff's noncompliance.  Defendant Elmore then

21  tried to persuade Plaintiff to comply, but failed as well.  It was only after both prison officials were

22  unsuccessful in gaining Plaintiff's compliance that Defendant Lewis, as the Facility Captain, became

23  involved and subsequently ordered the cell extraction.  Defendant Lewis's order was reasonable in

24  light of the clear threat to prison security posed by the missing metal clipper head.  Moreover, an

25  emergency room nurse was on stand-by during Plaintiff's extraction, in accordance to the SVSP Use

26  of Force Policy.  Ms. Pollan, the nurse who examined Plaintiff after he was extracted and

27  decontaminated, concluded that Plaintiff was "extracted without incident" and that the extraction did

United States District Court
For the Northern District of California

1   not exacerbate Plaintiff's asthma condition.  (Quinn Decl., Ex. B, Incident Report at AGO-0036.)

2         In his opposition, Plaintiff asserts that there was no need for Defendants to use an "enormous

3   amount of force" during the cell extraction.  (Opp'n at 3-4.)  He argues that Defendant Walker could

4   have used only one T-16 O.C. grenade, instead of three of them, to gain Plaintiff's compliance.  (Id.

5   at 4.)  Plaintiff's claim of disproportionate force is insufficient to establish malicious intent in light

6   of the deference courts give officers when it comes to the use of pepper spray.

7         The use of chemical irritants, such as pepper spray, is an accepted means of enforcing prison

8   discipline, including an officer's order to leave a cell.  Spain, 600 F.2d at 195.  The use of pepper

9   spray "in small amounts may be a necessary prison technique if a prisoner refuses after adequate

10  warning to move from a cell or upon other provocation presenting a reasonable possibility that slight

11  force will be required."  Id.  On the other hand, where pepper spray is used without warning and

12  opportunity for the prisoner to comply with the officers' orders, there is at least an inference that the

13  instrumentality was used for punishment rather than in furtherance of a legitimate prison interest.

14  See id. (noting that tear gas may not be used for punishment and may be used in furtherance of a

15  legitimate prison interest only when absolutely necessary); Michenfelder v. Sumner, 860 F.2d 328,

16  335-36 (9th Cir. 1988) (same).

17        In the instant case, the evidence shows that Defendant Lewis ordered the use of pepper spray

18  to extract Plaintiff only after he was repeatedly warned and was given enough opportunities to

19  comply with their orders.  Plaintiff's and his cellmate's initial response of pulling linen from the top

20  bunk to cover themselves was correctly perceived as their refusal to comply.  The Court finds

21  unavailing Plaintiff's argument that Defendant Walker's use of three T-16 O.C. grenades created a

22  triable issue of fact as to whether they administered pepper spray "maliciously and sadistically."

23  The evidence shows that Defendant Walker first deployed three T-16 O.C. grenades and utilized a

24  MK-9 in an attempt to gain compliance from Plaintiff and his cellmate.  (Walker Decl. ¶ 13.)  When

25  both inmates continued to pull linen and other clothing from the top bunk in order to cover

26  themselves and avoid the effects of the chemical agents, Defendant Walker used a MK-46 and

27  sprayed inside the cell.  (Id.) Following the discharge of the MK-46, both inmates submitted to

28

United States District Court
For the Northern District of California

17

**United States District Court**
For the Northern District of California

1   unclothed body searches and were placed in handcuffs.  (Id. at ¶ 14.)  Indeed, the videotape evidence

2   corroborates Defendants' allegation that they administered pepper spray only after Plaintiff

3   continually refused to comply with their demands that he submit to handcuffs.  Therefore,

4   Defendants' use of force in this incident deserves the deference given to "prophylactic or preventive

5   measures intended to reduce the incidence of . . . breaches of prison discipline."  Whitley, 475 U.S.

6   at 322.  There is no evidence of a disproportionate use of force; instead, the evidence shows that the

7   pepper spray was used by Defendants in a good faith effort to restore discipline because Plaintiff

8   kept refusing to submit to handcuffs and prevented them from searching for the missing metal

9   clipper head.  Viewed in the light most favorable to Plaintiff, the facts indicate that Defendant

10  Walker acted reasonably; therefore, there was no need for Defendants Prewitt, Narvaez, Gantt,

11  Busick, Lonero, Lima, Mata, Hood, and Nuno to intervene.

12         In sum, Plaintiff fails to raise a genuine issue of fact regarding Defendants Walker, Lewis,

13  and Elmore's malicious intent and regarding the need for Defendants Prewitt, Narvaez, Gantt,

14  Busick, Lonero, Lima, Mata, Hood, and Nuno to intervene.  Accordingly, Defendants are entitled to

15  summary judgment on the excessive force claim as a matter of law.  See Celotex Corp., 477 U.S. at

16  323.

17  **IV.**    **Qualified Immunity Defense to Excessive Force Claim**

18         Defendants argue, in the alternative, that summary judgment is warranted because, as

19  government officials, they are entitled to qualified immunity from Plaintiff's excessive force claim.

20         **A.**    **Applicable Law**

21         The defense of qualified immunity protects "government officials . . . from liability for civil

22  damages insofar as their conduct does not violate clearly established statutory or constitutional

23  rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818

24  (1982).  The threshold question in qualified immunity analysis is:  "Taken in the light most

25  favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a

26  constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  A court considering a claim of

27  qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual

28  constitutional right and whether such right was "clearly established."  Pearson v. Callahan, __ U.S.

__, 129 S. Ct. 808, 818 (2009) (overruling the sequence of the two-part test that required determination of a deprivation first and then whether such right was clearly established, as required by Saucier and holding that court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Saucier, 533 U.S. at 202.

**B.   Analysis**

The Court has found that, viewing the evidence in the light most favorable to Plaintiff, Defendants' actions did not amount to an Eighth Amendment violation.  Even if a constitutional violation had occurred, it would not have been clear to a reasonable officer in Defendants' position that their conduct violated the prohibition against excessive force, particularly in light of the security threat posed by the missing metal clipper head and Plaintiff's noncompliance.  It is not disputed that, at the time of Defendants' actions, the malicious and sadistic use of force against prisoners was a violation of the Eighth Amendment.  However, a reasonable officer could have believed that the amount of force used was lawful in light of clearly established law and the information Defendants possessed at the time of the incident.  See Saucier, 533 U.S. at 205 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)) (reasonableness of officer's belief as to appropriate level of force should be judged from an on-scene perspective).

Officers are entitled to make considered judgments, as well as reasonable mistakes, about the amount of pepper spray necessary to prevent a breach of discipline from becoming more severe.  See Clement, 298 F.3d at 904.  In Clement, prison officials broke up a fight between two inmates confined to a cell using two bursts of pepper spray.  Id.  Nearby inmates claimed the officers dispensed a second burst of pepper spray after the targeted inmates began to cough and gag.  Id.  The officers stated they deployed the second burst because the first burst failed to hit the fighting inmates square on.  Id.  The Ninth Circuit held that the second burst did not imply the officers acted maliciously.  Id.

Here, the reasonableness of Defendants' actions is demonstrated by the fact that they present undisputed evidence, including a videotape, to explain why they used pepper spray in the quantity

United States District Court
For the Northern District of California

and at the time they did.  The SVSP Use of Force Policy allows extractions when there is a clear threat to prison security.  (Walker Decl., Ex. A.)  According to the Incident Report, the "dangerous metal portions of a clipper head was missing" and these metal parts "could be utilized to manufacture weapons by cutting pieces of metal from the cell doors or sink and toilet areas." (Quinn Decl., Ex. B, Incident Report at AGO-0010.)  Because the missing metal parts could be used to manufacture weapons, they pose a threat to prison security.  Defendants' use of pepper spray in extracting Plaintiff from his cell was thus a reasonable response to this security threat, given Plaintiff's refusal to submit to handcuffs.

In addition, a cooling off period was initiated to give Plaintiff enough time to comply with the staff's instructions.  According to the SVSP Use of Force Policy, "[i]n non-emergency situations, a cool down period shall be utilized to allow the inmate to comply with staff's instructions . . . . **Generally, the reasonable cool down period would be the time it takes to establish and to prepare the tactical extraction team.**"  (Walker Decl., Ex. A (emphasis in original).)  It took approximately thirty minutes to assemble the extraction team and to retain a nurse and a video camera operator for the extraction.  The time it took to assemble the extraction team, which suffices as the "cool down period," afforded Plaintiff sufficient time to comply and submit to handcuffs prior to the cell extraction.  Yet he persisted in his refusal to comply.  Nothing in the record suggests that the use of force during the cell extraction was disproportionate.  Therefore, Defendants could reasonably have believed that the force they used was necessary after Plaintiff repeatedly failed to comply with orders.  Defendants used pepper spray in response to Plaintiff's repeated refusal to cooperate.

Defendants claim to have used reasonable force in a good faith effort to restore and maintain discipline.  See Jeffers, 267 F.3d at 912.  The Court finds that a reasonable officer in Defendants' position could have believed that their actions were lawful.  See Marquez v. Gutierrez, 322 F.3d 689, 691 (9th Cir. 2003).

Therefore, even if there was a constitutional violation, under Saucier, Defendants are entitled to qualified immunity with respect to Plaintiff's claim of excessive force and thus are entitled to summary judgment as a matter of law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (docket no. 52).  Defendants' motion to strike Plaintiff's sur-reply (docket no. 80) is DENIED.

The Clerk of the Court shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

This Order terminates Docket nos. 52 and 80.

IT IS SO ORDERED.

DATED: 7/27/09

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

P:\PRO-SE\SBA\CR.05\Rodriguez5068.grantMSJ.wpd